635 So.2d 373 (1994)
Joyce ADAMS, Wife of/and Alvin Adams
v.
Mark LAMMON, Jr., Cajun Contractors, Inc., and CNA Insurance Companies.
Joyce M. ADAMS, Wife of/and Alvin A. Adams
v.
George FABRE, Jr., et al.
Nos. 93-CA-1288, 93-CA-1289.
Court of Appeal of Louisiana, Fourth Circuit.
March 29, 1994.
Rehearing Denied May 12, 1994.
*374 Frank M. Repass III, New Orleans, for plaintiff/appellee.
Scott G. Jones, J. Thaddeus Westholz, Hulse, Nelson and Wanek, New Orleans, for defendants/appellants.
Before BARRY, KLEES and WARD, JJ.
BARRY, Judge.
The defendants, Mark Lammon, Jr., Cajun Contractors, Inc. and American Casualty Company of Reading, PA (CNA Insurance Companies), appeal a judgment in favor of plaintiff, Joyce Adams, in the total amount of $860,812. The issues are general and special damages and causation.

FACTS
Mrs. Adams was injured in two unrelated automobile accidents while she was in the front passenger seat of a van driven by her husband, Alvin Adams. The first accident occurred on November 19, 1986 when a vehicle driven by the defendant, Mr. Lammon, ran into the back of Mr. Adams' van on the entrance ramp to the eastbound South Claiborne Avenue overpass in New Orleans. It was established that at the time of the accident Mr. Lammon was in the course and scope of his employment with defendant Cajun Contractors. American Casualty provided liability insurance coverage. Mr. Lammon testified that he was moving at approximately five miles per hour. Mrs. Adams testified that the impact thrust her forward to the windshield.
The second accident occurred approximately four months later on March 23, 1987 when the 15,000 pound cab of an eighteen wheeler collided with the left, rear side of the Adams' vehicle as the Adams attempted to turn into the drive of their cleaners business on Florida Avenue in New Orleans. The cab was travelling approximately thirty miles per hour and hit the vehicle with such force that Mrs. Adams was almost thrown out of the sliding side door of the van.
Immediately after the first accident, Mrs. Adams felt pain and tingling from her neck and lower back down to her leg. From the November accident to early March, 1987 she complained of back pain with radiation down her left leg and she experienced some urinary incontinence. The severity of her symptoms was intermittent but continuing. She was diagnosed with a cervical strain atop pre-existing but previously asymptomatic spondylolisthesis.[1] She was treated conservatively and was recommended for physical therapy just prior to the second accident. The second accident, which occurred prior to commencement of physical therapy, exacerbated Mrs. Adams' symptoms. Conservative treatment continued until January 1989 when she underwent a decompressive laminectomy and lumbosacral fusion. Her condition continued to deteriorate following surgery.
The Adams' sued multiple defendants from both accidents and the cases were consolidated. *375 After a bench trial judgment was rendered against the defendants and damages were awarded to Mrs. Adams as follows:

GENERAL DAMAGES: $650,000
FUTURE MEDICAL EXPENSES: $150,812
PAST MEDICALS (stipulated): $ 50,000
LOSS EARNING CAPACITY: $ 10,000
 ________
TOTAL: $860,812

The trial court found that each accident contributed equally to Mrs. Adams' damages and rendered judgment against Lammon, Cajun Contractors and American Casualty for $430,406; and against the defendants in the second accident for $430,406 subject to 30% comparative fault of Mr. Adams only as to the second accident.
The defendants in the second accident also appealed but settled with the Adams. This appeal concerns Lammon, Cajun Contractors and American Casualty.

GENERAL DAMAGES
Defendants contend that general damages of $650,000 is excessive. We disagree.
The trier of fact is vested with great discretion when awarding general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. den., ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Reck v. Stevens, 373 So.2d 498, 501 (La.1979); Burton v. Berthelot, 567 So.2d 649, 661 (La. App. 4th Cir.1990), writ den. 569 So.2d 989 (La.1990). The appellate court should not disturb an award unless it is "beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances." Youn, supra; Reck, supra.
Mrs. Adams' pre-existing spondylolisthesis was severe but asymptomatic prior to the November 19, 1986 accident. She was very active with her family, church and community. She walked, cared for her family, including seven children, engaged in frequent sexual activity with her husband, cooked, cleaned house, helped paint the house and even wrestled with her sons. Following the accidents, she experienced symptoms of nerve root irritation at L5-S1 and eventually nerve damage. She had continual back pain with radiating pain down her leg. When her symptoms continued with great severity and objective tests indicated nerve damage,[2] she underwent a decompressive laminectomy and lumbosacral fusion. Despite initial post-operative improvement, Mrs. Adams' condition continued to deteriorate.
Mrs. Adams' back and leg pain increased in severity and greatly hindered her mobility. Physical examinations in the few months preceding trial revealed decreased sensation in her left leg and some numbness in her left calf. She spends up to 80%-90% of her time sitting or in bed and uses a wheelchair or walker. When she walks, it is with a "drop foot gait." Her activities have dramatically decreased. She cannot lift her young child or grandchild and she is virtually unable to engage in any sexual relations with her husband, and then only in pain. She is unable to sit or walk for any extended period; to lift pots; clean house or cook. Those activities have been taken over by family members. Her pain is excruciating. She takes large doses of medication (including Talacen) for pain. She experiences insomnia, is depressed and socially isolated.
Mrs. Adams suffers urinary and fecal incontinence and must use a bedside commode. She testified that urinary incontinence began as "dribbling" but got progressively worse until it became "stream[ing]." She has experienced urinary incontinence in public places, including the courtroom during trial and she must wear diapers. She often needs help after episodes of incontinence. Mrs. Adams will probably require lifelong care.
Defendants argue that the general damage award is excessive because Mrs. Adams only has an anatomical disability of 15% to 25% and testimony indicated that a pain clinic recommended by her treating physician would decrease the pain by 25% to 50% and increase her activity level twofold.
*376 Dr. Richard Morse, an expert in neuropsychiatry, recommended a four week pain clinic which could reasonably be expected to result in a 25% pain reduction. The recommendation was supported by four other physicians, experts in internal medicine, neurosurgery and orthopedic surgery. At the pain clinic, Mrs. Adams would undergo clinical detoxification from the medication Talacen, her muscle strength would be increased, she would be put on a weight loss program which would greatly increase her ability to ambulate, and she would be rehabilitated out of her wheelchair. Dr. Morse testified that with expected improvement she might be able to ride in a car for short distances, do light housekeeping and engage in more frequent sexual relations. However, the goal of the pain clinic would be to increase Mrs. Adams' activities in the home. She might improve to two hours of homemaker's duties per day, but only in intervals.
Dr. Anna Davis, expert in internal medicine, thinks Mrs. Adams would benefit from the pain clinic but that her prognosis as to quality of life is not good. Mrs. Adams will likely continue with urinary and fecal incontinence because of irreversible nerve damage. Dr. Davis testified that after the pain clinic Ms. Adams would continue to need medications, muscle relaxers, anti-depressants and nonsteroidal anti-inflammatory medications, for the duration of her life. She will have a continued possibility of urinary tract infections from bladder catheterizations.
Defendants further argue that the trial court improperly considered Mrs. Adams' incontinence in the general damages. However, we find that the record supports consideration of that condition.
Mrs. Adams testified that she began urinary incontinence a few days after the first accident and that she told her treating physician, orthopedic surgeon Dr. George Murphy, about the problem. Dr. Murphy's notes did not include incontinence until January 2, 1990. However, he testified that he did not customarily write down everything Mrs. Adams said and that his January 1990 note suggests that she experienced incontinence prior to that date.
Dr. Morse, neuropsychiatrist, testified that because medication can affect bladder function and because Talacen can cause a "relaxed" or "paralyzed" bladder, he would examine Mrs. Adams' bladder function after detoxification. Dr. Robert Applebaum, neurosurgeon, also testified that excessive narcotics could have impaired Mrs. Adams' bladder function, but he would defer to a urologist. Dr. Applebaum did not think Mrs. Adams' urinary incontinence was related to her lower back problem because a low back nerve injury would cause a flaccid bladder and high residual urine, as opposed to a spastic bladder.
Dr. Kathleen Walsh, urologist, stated that urologists are typically consulted for help in determining the extent of nerve damage to the bladder and its effect on bladder function. She testified that, although Mrs. Adams' stress incontinence "may or may not be" related to her back problems, her neurogenic, overflow incontinence is probably related. Moreover, Dr. Walsh testified that Mrs. Adams' post-void urine residual was "markedly above normal." Dr. Walsh opined that Mrs. Adams' incontinence was related to the trauma.
After considering all of the testimony, we have no basis to conclude that the trial court abused its great discretion in awarding Mrs. Adams general damages of $650,000.

FUTURE MEDICAL EXPENSES
Defendants argue that the record does not support the award of $150,812 for future medical expenses.
While future medical expenses need not be established with mathematical certainty, Burton v. Berthelot, supra at 663, they must be established with some degree of certainty and a plaintiff must show that expenses more probably than not will be incurred, Harris v. Tenneco Oil Co., 563 So.2d 317, 327 (La.App. 4th Cir.1990).
The estimated cost of the recommended pain clinic and follow-up is $25,500. Defendants do not contest that amount.
Dr. Davis, expert in internal medicine, testified that Mrs. Adams would require continued medication over her thirty year life expectancy *377 for the management of pain, muscle spasms, depression and other symptoms of nerve damage. Dr. Davis agreed that Mrs. Adams would benefit from the pain clinic, but she would require continued medication even following the four week pain clinic and follow-up.
Dr. Davis testified on cross-examination as follows:
Q: I'm talking about after she gets out of the pain clinic
A: I'm talking about after she gets out, the patients go home.
Q: How do you know right now without seeing her condition
A: Because I've seen many, many patients like this and thisyou are asking me what is the regimen that I would predict, I think that's what you're asking me.
Q: I'm not asking you to speculate
A: I'm not speculating, that's within the majority of patients that I've seen that have these problems, these are the classes of medications that are used to treat them....
* * * * * *
Q: You don't know the result of the pain clinic? Yet
A: I've worked on the pain clinic for eight years, I know the degree of her infirmity, you're asking me a clinical opinion and I'm telling you my clinical opinion, that this lady is going to require these medications.
Costs include a nonsteroidal anti-inflammatory medication taken three to four times daily ($70 per month), a muscle relaxer taken three to four times daily ($50 per month) and an anti-depressant ($60 per month). If Mrs. Adams needs catheterization for incontinence, a "maintenance" prophylactic antibiotic will be required to avoid infection ($25 per month). Costs for these medications totals $73,800 over Mrs. Adams' thirty year life expectancy. Additionally, Dr. Davis testified that Mrs. Adams would require four doctor visits per year totalling $5,400 over thirty years. Thus, medical expenses projected by Dr. Davis total $79,200.
Defendants also contest the award for future medical expenses associated with Mrs. Adams' incontinence, arguing that the evidence does not support either a finding that the incontinence is related to the accidents or that Mrs. Adams' incontinence will persist after the pain clinic.
As stated above, the record supports a finding that Mrs. Adams' incontinence is related to the accidents. Further, Dr. Kathleen Walsh, urologist, testified that Mrs. Adams would require lifelong care to deal with incontinence, including bi-monthly visits to a urologist, medication to help her empty her bladder, catheterization three to six hours a day if she is unable to empty her bladder, renal ultrasound every one to two years and twenty to thirty adult diapers each day. The total projected cost is $46,112 over a thirty-two year life expectancy.
Although Dr. Morse testified that Mrs. Adams' incontinence might improve following the pain clinic, the trial court adopted the findings of Dr. Walsh.
Defendants argue the award includes a $9,000.00 duplication for future medical expenses associated with Mrs. Adams' incontinence. The record does not support this argument.
Dr. Davis included in her estimate the cost of a prophylactic antibiotic to avoid infection from future catheterizations, totalling $9,000.00 over thirty years. Dr. Walsh's additional estimate of $46,112.00 represented future medicals associated with incontinence but did not specifically include prophylactic antibiotics. This award was not duplicative.
Mrs. Adams sustained her burden of proof as to future medical expenses. We affirm this award.

CAUSATION
Defendants argue that, considering the disparate forces involved in the two accidents, the trial court erred by determining that the first accident equally contributed to Mrs. Adams' damages.
It was established that, given the greater speed and weight of the vehicle in the second accident, that accident exerted a significantly *378 greater force on Mrs. Adams' body than the first accident.
Dr. Morse, neuropsychiatrist, testified that Mrs. Adams' back and lower extremity pain was attributable to the second accident. However, the record is replete with testimony from other physicians that the relative forces of the two accidents were insignificant as to Mrs. Adams' injuries; that each accident caused Mrs. Adams' condition and the effect of each accident could not be apportioned.
Dr. Walsh, urologist, testified that Mrs. Adams' incontinence was caused by both accidents and a December 31, 1989 fall, but the damage could not be apportioned. Dr. Murphy, orthopedic surgeon, testified that Mrs. Adams' problems stem from a damaged nerve referable to both accidents and that "(he does not) think there is any way you can separate them out." Dr. Murphy attributed no significance to the difference in the forces of the accidents or to the fact that surgery was not planned before the second accident. According to Dr. Murphy, Mrs. Adams' pre-existing spondylolisthesis was severe and it would take very little to make the nerve become symptomatic. Dr. Murphy further testified that, unlike other injuries, severe spinal injuries can result from a relatively small force, and accident victims can escape unharmed from greater forces. His testimony was corroborated by Dr. James Williams, an orthopedic surgeon.
We conclude that the trial court's apportionment of damages to each accident was proper.
The judgment of the trial court is affirmed.
AFFIRMED.
WARD, J., dissents with reasons.
WARD, J., dissents with reasons.
I dissent because I believe the trial court erred by finding that the first and second accidents contributed equally to Mrs. Adams' damages. Contrary to what the majority says, the record does not support the trial court's finding.
This appeal is the result of two consolidated actions arising from two separate automobile accidents, approximately four months apart. Both accidents were rear-end collisions. The first accident occurred November 19, 1986, while the Adams' van was at a complete stop waiting to merge with eastbound traffic. The Adams' van was rear-ended by a pick-up truck driven by Lammon, then employed by Cajun. Lammon's estimated speed at impact was 5 miles per hour. Mrs. Adams was a passenger in the van driven by her husband. The vehicles were driveable after the accident and, according to Mrs. Adams' testimony, they attempted to proceed with the errands that they had set out to do that day but were unable to complete those errands due to the pain in her back and leg.
Six days after the accident, Mrs. Adams sought medical attention from Dr. George Murphy, an orthopedic surgeon. Dr. Murphy diagnosed a severe lumbar strain superimposed on a preexisting spondylolisthesis. Spondylolisthesis is a degenerative condition of the spine in which the bones of the spine are misaligned, which may or may not cause pain. This condition may be congenital or trauma induced. Dr. Murphy treated Mrs. Adams' condition conservatively for almost 4 months with improvement of the lumbar strain coming and going. No surgery was anticipated by Dr. Murphy, and on March 9, 1987, Dr. Murphy noted that Mrs. Adams was improving. Mrs. Adams also stated that she felt "pretty good" at that visit. Dr. Murphy concluded at that time that Mrs. Adams for ready for, and would benefit from, physical therapy.
The second accident occurred March 23, 1987. Mrs. Adams was again the passenger in the van driven by her husband and the other vehicle, driven by George Fabre, was a 15,000 pound tractor/truck traveling at between 30-40 miles per hour at the time of the collision. In this accident, Mrs. Adams was partially ejected from the van's rear sliding door from the force of the collision. The van was a total loss and Mrs. Adams was immediately taken to Jo Ellen Smith Hospital where she complained of pain beginning in her lower back with numbness radiating down into both legs. Mr. Adams was found to be 30% *379 at fault in this accident and Fabre 70% at fault.
Dr. Murphy continued conservative treatment of Mrs. Adams over the next twenty months but on December 27, 1989, after a follow-up EMG study revealed nerve root damage at the L5-S1 level, he decided that Mrs. Adams needed surgery. The L5-S1 is located at the base of the spine, the tailbone. Following a lumbar laminectomy with lumbosacral fusion at the L5-S1 level of her spine, Mrs. Adams was assigned a 15%-25% anatomical disability and was recommended to a pain clinic in order that she might learn to cope with the residual pain. Her condition will not be improved by further surgery, therefore, none was recommended, nor anticipated.
After the first accident, Mrs. Adams described the pain as a "tingling" down her lower back to her leg. She said that her neck stiffened up, the pain got worse down her spine, and her leg began to knot up. During the course of conservative treatment, the pain varied, increasing and decreasing. Mrs. Adams testified that she got around the house with a cane, stayed in bed some of the time, and could not carry pots of water or cook without assistance. However, at her last visit to Dr. Murphy before the second accident, Mrs. Adams reported that she felt better and Dr. Murphy, after performing certain tests, was satisfied that she had progressed sufficiently to benefit from physical therapy.
In comparison, after the second accident Mrs. Adams' leg pain worsened, her leg would collapse, the back pains were worse, she experienced many headaches, and her sex life continued to decline. She was taken to the hospital immediately after the second accident and the pain was described as a "numbness" radiating down both legs.
In addition, expert testimony was also offered to show the force exerted against Mrs. Adams' body in the first accident was equivalent to approximately two times her body weight. In the second accident the force was equal to eighteen times her body weight. Dr. Morse also testified that it was his opinion that most of her pain resulted from the second accident and not the first. (Tr., Vol. III, p. 55). No testimony was offered to contradict Dr. Morse's statement.
"When there are two accidents the damages must be apportioned if possible, although apportionment has some degree of arbitrariness inherent in the process." Buccola v. Marchese, Holsum Bakeries, Inc. and Northbrook Property & Casualty Insurance Company, 599 So.2d 892, (La.App. 4th Cir. 1992).
Once it is determined that the defendant's conduct has been a cause of some damage suffered by the plaintiff, a further question may arise as to the portion of the total damage sustained which may properly be assigned to the defendant, as distinguished from other causes. The question is primarily not one of the fact of causation, but of the feasibility and practice convenience of splitting up the total harm into separate parts which may be attributed to each of two or more causes. Where a logical basis can be found for some rough practical apportionment, which limits a defendant's liability to that part of the harm which he has in fact caused, it may be expected that the division will be made. Prosser on Torts, p. 266, 2d ed.
The evidence presented as to the medical condition of Mrs. Adams after each accident, her own description of the pain as a sensation of "tingling" after the first accident as compared to a sensation of numbness after the second accident, the size and speed of the vehicles involved and the damage done to the Adams' van after each accident, the expert testimony as to the amount of force exerted on Mrs. Adams' body in each accident, and finally the testimony of her own expert as to the source of most of her pain indicate that the surgery was a result of the second accident, and not the first. Therefore, there was manifest error in the trial court's findings of equal liability between the first and second accidents.
NOTES
[1] Mrs. Adams' spondylolisthesis was described as a developmental condition of forward displacement of the L5 vertebra over the S1 vertebra. The condition causes constriction of the dural sac and stretching of the nerves at L5-S1.
[2] Plaintiffs' expert in orthopedic surgery testified that, unlike nerve root irritation which is diagnosed from the patient's symptoms, actual nerve damage can be shown in nerve tests. He stated that he continued to treat plaintiff conservatively (i.e., without surgery) until her tests revealed actual nerve damage.