703 So.2d 207 (1997)
Felix HOSKIN, Jr.
v.
PLAQUEMINES PARISH GOVERNMENT.
No. 97-CA-0061.
Court of Appeal of Louisiana, Fourth Circuit.
December 1, 1997.
Rehearing Denied December 30, 1997.
*208 Brian J. Waid, Denise L. Martin, Bubrig and Waid, Buras, for appellant Felix Hoskin, Jr.
Sidney W. Degan, III, R. Edward Blanchard, Degan, Blanchard & Nash, New Orleans, for appellee The Lexington Insurance Company.
Stephen C. Braud, Parish Attorney, Michael L. Mullin, Assistant Parish Attorney, Belle Chasse, for appellee Plaquemines Parish Government.
Before SCHOTT, C.J., and BARRY, KLEES, PLOTKIN and CIACCIO, JJ.
BARRY, Judge.
Plaintiff appeals an award of $301,465.17. We increase the award for past medicals by $1,250.51 (total $88,005.68); future medicals by $9,980 (total $12,500); general damages by $100,000 (total $300,000); and future lost wages to $1,500. We affirm as amended.
Felix Hoskin owns and operates Hoskin Inc., a company that contracts out drag lines and bulldozers. He was injured on October 27, 1994 when a Caterpillar excavator, operated by a Plaquemines Parish employee, struck him and pinned his legs between the *209 tracks of the backhoe. He received a compound fracture of his right femur and a very severe crush injury to his left thigh.
Dr. Chris Digrado, orthopedist, operated on Hoskin's right leg the day of the accident.[1] Dr. Digrado inserted a rod into the femur to stabilize it during healing and he discharged Hoskin on November 8, 1994. Dr. Digrado testified that in April 1995 (six months after the accident) Hoskin's right femur was "basically healed," Hoskin was ambulating without crutches, the range of motion in his knee was increasing, and he could return to work. Dr. Digrado removed the femoral rod on June 17, 1996. Hoskin has fifteen degree residual impairment of motion in his right knee.
Dr. Charles Dupin, plastic surgeon, operated on Hoskin four times. The day after the accident Dr. Dupin debrided and closed the right leg wound where the femur had ruptured the skin. A few days later Dr. Dupin removed fluid from the left leg. After Hoskin's initial hospital discharge on November 8 the right leg wound became infected. On November 10, 1994 Hoskin was readmitted and Dr. Dupin drained and cleaned the leg. The right leg did nt properly heal so Dr. Dupin performed a skin graft on December 5, 1994 and Hoskin was discharged two days later. The right leg wound healed by late December 1994 with a deforming scar. Hoskin continued to experience numbness and weakness in his left thigh due to muscle displacement caused by the accident.
While in the hospital Hoskin developed an ulnar nerve (near the elbow) irritation which Dr. Digrado described as a "positional" problem caused by the patient's arm position during extended bedrest. In August 1995 Hoskin complained of numbness in three fingers. Dr. Digrado testified that Hoskin could undergo an ulnar nerve transposition, outpatient surgery under regional anesthetic.
Hoskin saw clinical psychologist Dr. Brian Jordan in March 1996 and was diagnosed with moderately severe chronic post-traumatic stress disorder. Hoskin complained of depression, anxiety, sexual dysfunction, and recurring dreams. Dr. Jordan said Hoskin tends to downplay his problems and works hard to satisfy work demands. He stated that Hoskin would need continued medication and psychotherapy.
Hoskin sued Plaquemines Parish and its insurer Lexington Insurance Company. After a bench trial the court awarded $301,465.17 as follows:

Past medical expenses: $ 86,755.17
Future medical expenses: 2,520.00
Past lost wages: 12,190.00
General damages: 200,000.00

Hoskin argues that the trial court inadvertently omitted $1,250.51 for past medicals; awarded no future medicals or future lost wages for two anticipated future surgeries; general damages were inadequate; failed to award his loss of future earning capacity; and excluded evidence relevant to future earning capacity.

Past Medical Expenses
Hoskin argues that the trial court inadvertently omitted $1,250.51 in past medical expenses incurred due to his June 17, 1996 surgery to remove the rod from his right femur. Plaquemines Parish concedes this issue, and Lexington does not dispute the expense assuming evidence is in the record.
The record contains a copy of the anesthesia bill in the amount of $550. Hoskin claims $50.51 in prescriptions. Receipts in evidence substantiate that amount.[2] Hoskin also claims $650 for Dr. Digrado's surgery fee. Dr. Digrado's deposition shows that prior to the surgery he estimated that amount.
Therefore we increase the award for past medicals $1,250.51, for a total of $88,005.68.

Future Medicals
Hoskin claims the trial court should have awarded future medicals for ulnar nerve surgery on his arm and scar reduction surgery *210 on his right leg. He complains that the trial court applied an incorrect burden of proof for future medicals. That argument has merit.
The trial court awarded $2,520 for future medicals for "ongoing psychological treatment and follow-up care related to the removal of the rod from (Hoskin's) leg." The court held that Hoskin did not establish that he is entitled to expenses for future surgery, stating:
An award for future medical expenses is premised on proof that future medical expenses are necessary and inevitable. Turner v. Pelican, 94-CA-1926 (La.App. 4 Cir. 9/15/95) [661 So.2d 1065]....
The court reasoned that although Dr. Digrado and Dr. Dupin testified that surgery is within the realm of possibility, plaintiff did not prove that either surgery is necessary and inevitable because neither the ulnar nerve irritation nor the leg scar causes a functional disability.
Hoskin is not required to prove that future medicals are "necessary and inevitable." This Court's recent opinions concerning the correct standard to determine whether a plaintiff has proved entitlement to future medical expenses have applied the "preponderance of the evidence" and "necessary and inevitable" standards.
That stems from the Supreme Court's per curiam opinion in Stiles v. K Mart Corp., 597 So.2d 1012 (La.1992), which states:
When the record establishes that future medical expenses will be necessary and inevitable, the court should not reject an award of future medical expenses on the basis that the record does not provide the exact value of the necessary expenses, if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required. La.Code of Civ. Proc. art. 2164.
The judgment of the court of appeal as to future medical expenses is set aside, and the case is remanded to the court of appeal to fix an award for future medical expenses which the medical evidence established that plaintiff, more probably than not, will be required to incur.
Id. at 1013. [Emphasis added.]
Prior to Stiles, our courts consistently applied the preponderance of the evidence standard to determine whether a plaintiff proved entitlement to future medical expenses. The Supreme Court addressed the issue in one case after Stiles. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1262 (La.1993), cert. den. 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), which quoted the necessary and inevitable standard without mentioning the "more probably than not" language. However, neither Stiles nor Youn indicated that the Louisiana Supreme Court intended to change the standard for determining entitlement to future medical expenses.
The dual standards are utilized in several opinions of this Court. In Turner v. Pelican, 94-1926, p. 7 (La.App. 4 Cir. 9/15/95), 661 So.2d 1065, 1069, writ den. 95-2513 (La.12/15/95), 664 So.2d 441, and Dixon v. Winn-Dixie Louisiana, Inc., 93-1627, p. 23 (La.App. 4 Cir. 5/17/94), 638 So.2d 306, 322, the panels adopted the "necessary and inevitable" standard. However, Carmen v. Gonzalez, 93-2418, p. 7 (La.App. 4 Cir. 5/17/94), 637 So.2d 1108, 1113, and Adams v. Lammon, 93-1288 (La.App. 4 Cir. 3/29/94), 635 So.2d 373, 376, writ den. 94-1545 (La.9/23/94), 642 So.2d 1301, used "more probable than not." In Rice v. ABC Insurance Co., 95-2008, p. 3 (La.App. 4 Cir. 4/3/96), 672 So.2d 1109, 1112, writ den. 96-1113 (La.6/7/96), 674 So.2d 971, this Court held that the plaintiff must "prove that [future medical] expenses will be necessary by a preponderance of the evidence," seeking to combine the two standards. Neither Fourth Circuit nor other Louisiana cases have previously discussed the appropriate standard, they simply applied one or the other.
We follow the approach in Rice, which is in accord with the Supreme Court's intent expressed in Stiles. Rather than adopt one paragraph of Stiles or the other, Rice recognized that the Supreme Court intended that the standard of proof be preponderance of the evidence and that evidence *211 presented must indicate that the future medical expenses would be medically necessary. Rice does not refer to "inevitable," which we reject. Thus, we hold that the proper standard to determine whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence that the future medical expenses will be medically necessary.
Plaquemines Parish and Lexington do not dispute that plaintiff's burden of proof for future medicals is preponderance of the evidence, but argue that Hoskin did not sustain his burden. Plaquemines Parish and Lexington argue that a physician's testimony that he might consider future surgery does not establish with legal certainty that the surgery will be undertaken, citing Jones v. Sampey Brothers General Construction, Ltd., 544 So.2d 1192 (La.App. 5 Cir.1989). The doctor in Jones speculated about the need for future surgery based on symptoms that the plaintiff might develop. See also Coffil v. New Orleans Public Service, Inc., 453 So.2d 1226 (La.App. 4th Cir.1984). Unlike Jones, the future medical expenses which Hoskin claims are based on his condition at trial. We conclude that Hoskin proved the necessity of two surgical procedures to correct conditions which presently exist and that he will incur future medical expenses.
Photographs show Hoskin's scar at the site of the skin graft, indented along a thick line several inches long. Dr. Dupin stated that the scar could be surgically removed. Hoskin testified that he wants the surgery but he delayed because he considered completion of the femoral surgery to be primary. Considering that Hoskin underwent the rod removal surgery seven days before trial, his failure to request the scar reduction prior to that time is reasonable. Dr. Dupin testified that his fee for the surgery would be $1,200 to $1,500 and hospital costs $3,500 to $4,000.
Hoskin proved that he will probably incur expenses for ulnar nerve transposition surgery. In August 1995 Hoskin saw Dr. Digrado and complained of numbness in three fingers. Dr. Digrado noted decreased sensation in the ulnar distribution of Hoskin's hand and he recommended that Hoskin see a neurologist for nerve conduction studies. Hoskin testified that he did not follow through with that recommendation because he was more concerned about his leg. He said he continues to experience numbness in two fingers, extending to his elbow. Dr. Digrado did not mention whether Hoskin suffers functional impairment from the nerve irritation, but stated that he could perform an ulnar nerve transposition on an outpatient basis. Hoskin indicated interest in the surgery.
Dr. Digrado did not give the cost of the ulnar nerve surgery. However, because Hoskin established the need for future medical expenses, the court should not reject that award on the basis that the record does not provide the exact value if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required. Stiles v. K Mart Corp., 597 So.2d at 1013. See also Rice v. ABC Insurance Co., 672 So.2d at 1112.
The West Jefferson Medical Center Outpatient Services bill for Hoskin's June 17, 1996 femoral rod removal was $4,522.40. Adding $1,250.51 for the anesthesia bill, prescriptions, and surgery fee, the amount totals $5,772.91. Considering that the ulnar nerve outpatient surgery will require only regional anesthetic, we conclude that $5,280 is the minimum amount that reasonable minds could not disagree would be required for the ulnar nerve transposition surgery, including the hospital or short stay unit and the doctors' fees. Added to $4,700 for the scar reduction (the minimum amount to which Dr. Dupin testified), the total estimated costs for future surgeries is $9,980. Accordingly, we increase the future medicals from $2,520 to $12,500.

General Damages
Hoskin argues that $200,000 for general damages was an abuse of discretion and should be increased. That argument has merit.
*212 General damages involve mental and physical pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other losses of lifestyle which cannot be definitively measured in monetary terms. Thibodeaux v. USAA Casualty Insurance Co., 93-2238, p. 7 (La. App. 1 Cir. 11/10/94), 647 So.2d 351, 356. The primary objective is to restore the injured party as nearly as possible to the state he was in immediately preceding the injury. Id., citing McCray v. Abraham, 550 So.2d 244, 248 (La.App. 4th Cir.1989).
This Court should not compare awards in other cases to determine if the trial court abused its discretion.
Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion.
Youn v. Maritime Overseas Corp., 623 So.2d at 1260.
We agree that $200,000 is "beyond that which a reasonable trier of fact could assess" for the effects of Hoskin's injury. Youn v. Maritime Overseas Corp., 623 So.2d at 1261.
Hoskin was forty-two years old when he suffered a compound fracture of his right femur and a crushing injury to his left thigh. He waited in agony at the remote scene of the accident for one and a half hours before the ambulance reached him. He was initially hospitalized for more than a week. A couple of days after he was discharged, Hoskin developed problems which necessitated an additional month of hospitalization. He spent over forty days in the hospital.
Hoskin endured six surgeries under general anesthesia. A rod was inserted into his right femur the day of the accident and removed a year and a half later. Four surgical procedures were necessary to drain fluid from his left thigh, debride and clean the wound on his right leg, and implant a skin graft at the site of his right leg wound. He has a deforming scar which will require future surgery on his right leg. A section of his left leg is permanently numb. Hoskin developed numbness in his fingers extending to his elbow due to the position assumed during extended bedrest. He will likely undergo surgery to correct that problem.
Hoskin was virtually incapacitated from October 1994 to May 1995. Dr. Digrado testified that Hoskin began bearing 50% of his weight on the right leg in February 1995 and 100% weight in March 1995. Six months after the accident Hoskin's right femur had "basically healed" and Hoskin returned to work. Dr. Digrado assigned a fifteen degree (ten percent) loss of flexion to the right knee, an anatomical disability. Although Dr. Digrado said Hoskin should be able to jump, run, and work, Hoskin experienced left leg weakness and had difficulty running and climbing at least fourteen months after the accident.
Dr. Dupin testified that the crushing injury to Hoskin's left leg caused muscle displacement. A portion of Hoskin's left leg is permanently numb, but that should not functionally impair him. Dr. Dupin said that Hoskin's present limitations are "musculoskeletal," and he deferred to Dr. Digrado to assign a percent disability.
Jeffery Carlisle, vocational rehabilitation counselor, examined Hoskin on May 21, 1996. He testified that Hoskin "should be able to resume his usual work activity on a full-time basis" and he presented a list of alternative employment possibilities of which Hoskin is capable in the event Hoskin's corporation ceases to operate.
Hoskin recovered well and returned to work in May 1995. (The evidence contains an invoice from Hoskin's air boat business dated May 17, 1995.) However, he testified that he continues to experience pain in his right leg and it is difficult to mount and operate a crane. He experiences irritation of both legs when he operates heavy, vibrating equipment and he complains of weakness in his legs. He said he cannot run and has difficulty stooping and jumping. He fears he will be crippled.
Dr. Jordan testified that Hoskin works to capacity and his complaints of pain are "solidly in the objective range." Dr. Jordan said Hoskin suffers from chronic post-traumatic *213 stress disorder and would need medication and psychotherapy bi-monthly for at least six months.
Dr. Dupin did not establish the recovery period for Hoskin's scar reduction surgery. Dr. Digrado testified that Hoskin would require six to eight weeks to recover from the ulnar nerve surgery.
Having concluded that the trial court abused his discretion by awarding only $200,000 general damages, we examine other cases to determine the lowest amount that reasonably could have been awarded. Cases cited by the trial court are instructive.
In Couvillion v. Shelter Mutual Insurance Co., 95-1186 (La.App. 1 Cir. 4/4/96), 672 So.2d 277, the plaintiff was hit by a car when he was 49 years old. He sustained a closed fracture of his right tibia and fibula, a head injury, and ulnar nerve neuropathy which would require future surgery. A rod was inserted in his leg during healing, and he needed surgery to remove the rod. The injury resulted in a shortening of plaintiff's leg by an inch. The accident caused permanent double vision in one eye which required corrective glasses. Plaintiff underwent two surgeries and missed sixteen months of work. The trial court awarded general damages of $245,000 ($150,000 for his leg injury, $50,000 for his arm, and $45,000 for his head and eye injuries).
The plaintiff in Lennix v. Labee, 94-748 (La.App. 5 Cir. 2/15/95), 652 So.2d 50, writ den. 95-0678 (La.4/28/95), 653 So.2d 594, sustained a compound fracture of his arm, dislocated foot, fractured femur that required insertion of a rod to heal, lacerations, muscle damage in his arm, and resulting 35% total body disability. He underwent surgery three times, spent six weeks in the hospital and rehabilitation center, and anticipated future surgery to remove the rod from his leg. The trial court awarded general damages of $250,000 which was not appealed.
In Bordelon v. South Central Bell Telephone Co., 617 So.2d 1337 (La.App. 3d Cir. 1993) the jury awarded $255,000 in general damages (including $25,000 for disfigurement of plaintiff's leg). Plaintiff fractured his femur and fibula, received multiple lacerations on his head and face, underwent surgery which required placement of a metal rod in his leg bone and a skin graft which caused a scar on his leg, and his preexisting spondylolysis became symptomatic. He recovered well but had permanent scars on his face, arm and legs, decreased feeling and strength in his hand, pain, a limp, and a ten to fifteen percent disability. He could not return to his pre-injury work.
Hoskin compares the effects of his injuries to those suffered by the plaintiff in Youn v. Maritime Overseas Corp., supra, which warranted $1,400,000 for general damages. The cases are similar to the extent that Hoskin and Youn sustained a severe leg injury, waited at least an hour at the scene of the accident for medical assistance, underwent several surgeries, and suffered emotional distress. However, we agree with the trial court that the injuries were vastly different. Youn severed his femoral artery, injured nerves to the leg, endured a muscle injury described "as if muscle tissue had been squeezed out like toothpaste," and lost two-thirds of his quadriceps muscle. Youn, 623 So.2d at 1259. After the accident and surgery, Youn's leg was "useless for anything other than support" and was "gruesome," consisting of bone, artery and heavily scarred skin. Id. The trial court had "never seen such a dismaying scene." Id. Youn's disability was permanent and likely to worsen. His life was constantly endangered by the condition of his leg. His marriage and self esteem suffered, and his doctor said that Youn had little chance for gainful employment in his native Korea.
Hoskin's injury produced effects comparable to those in Couvillion, Lennix, and Bordelon. This case warrants higher general damages because Hoskin was 42 years old, sustained severe injury to both legs, awaited emergency medical assistance in agony for one and a half hours while he feared losing his leg, endured an infection and six surgical procedures. He has a disfiguring scar on his right leg and pain and weakness in both legs, has an anatomical disability due to the decreased flexion in his knee, fears being crippled, suffers chronic, moderately severe post-traumatic stress disorder which will *214 likely require treatment, and he will likely undergo two additional surgeries. After carefully considering Hoskin's injury and its effects, we conclude that the least amount which could reasonably be awarded for general damages is $300,000.

Lost Wages
The trial court awarded $12,190.00 in past lost wages, but did not discuss the evidence upon which that was based. Hoskin argues that the trial court erred by not awarding lost wages in connection with the femoral rod removal and the future ulnar nerve and scar reduction surgery. Plaquemines Parish and Lexington respond that an increase in the lost wage award is not warranted because Hoskin did not prove that he will probably undergo future surgery and because the general damage award adequately compensates him for lost wages in connection with the rod removal.
Many cases consider loss of future earnings together with loss of earning capacity. See Aisole v. Dean, 574 So.2d 1248, 1252 (La.1991); Daigle v. United States Fidelity & Guaranty Insurance Co., 94-0304, pp. 16-17 (La.App. 1 Cir. 5/5/95), 655 So.2d 431, 442. In Couvillion v. Shelter Mutual Insurance Co., supra, the trial court awarded future lost wages that exactly corresponded to the amount of income the plaintiff's economist testified would be lost during the recuperative period for future surgery. Couvillion, 672 So.2d at 285. On appeal the plaintiff complained that the trial court denied damages for loss of earning capacity. In affirming that award, the appellate court held that the trial court could award lost future income due to anticipated surgery although the plaintiff did not prove loss of earning capacity:
(W)e do not believe the trial court was required to award a separate amount for loss of earning capacity, but could have included damages for this item within an award for loss of future earnings.... However, in this case, ... the trial court obviously awarded plaintiffs future lost wages only for the anticipated recuperative period and did not include any amount for loss of earning capacity.
Id. (The Court affirmed the denial of loss of earning capacity.)
Dr. Digrado testified that the rod removal surgery (a week before trial) and the future ulnar nerve surgery would require about six weeks for recovery. There is no testimony concerning the recovery period for the scar reduction.
Hoskin owns his own company. The evidence supports his testimony that neither his work nor his income are steady. Hoskin's personal income tax returns for 1991 through 1994 show a $205,344 casualty loss in 1991, adjusted gross income of $60,585 in 1992, $73,737 in 1993, and $36,067 in 1994. The returns reveal that most of that income was from rents, royalties, pensions and annuities, and only a small portion represents shareholder income from Hoskin, Inc. Hoskin's shareholder income from Hoskin, Inc. was $13,832 in 1991, $10,821 in 1992, $6,222 in 1993, and $8,454 in 1994. The tax returns for Hoskin, Inc. corroborate that. They also reflect losses for Hoskin, Inc. in 1989 and 1990, a $21,832 income in 1991, $20,684 in 1992, $6,222 in 1993, and $8,454 in 1994.
Considering that evidence, the trial court could have considered the rod removal surgery when he awarded past lost wages of $12,190. Because Hoskin established the need for future ulnar nerve surgery which will require six weeks of recovery, we award $1,500 for lost income due to the recuperative period for that surgery.

Loss of Future Earning Capacity
Hoskin complains that he should have recovered for loss of future earning capacity, arguing that his injuries reduced his ability to compete in the work force. The trial court denied recovery because Hoskin is a business owner who has never competed in the general work force and, although Hoskin would be at a competitive disadvantage were he to seek employment in the general market,
(t)here is no evidence ... that Hoskin is unable to perform a job as a heavy equipment operator based on his injuries and post-recovery condition. In fact, he has been doing that job for his own company.

*215 To compensate Hoskin for a loss of marketability in the work force when there is no evidence that he would ever in fact attempt to enter the competitive work force is not justified.
Loss of earning capacity, different from lost wages, refers to a person's potential and compensates a victim for his lost ability to earn in the future. Masters v. City of New Orleans, 94-2349, p. 2 (La.App. 4 Cir. 9/28/95), 662 So.2d 125, 126.
The trial court should consider plaintiff's physical condition before the accident, plaintiff's work record, amount earning in previous years and the probability that except for the injury the plaintiff would have earned similar wages the rest of (his) life.
Id.
The plaintiff's earnings at the time of the accident are relevant but not necessarily indicative of his past or future earning capacity. Finnie v. Vallee, 620 So.2d 897, 900 (La.App. 4th Cir.), writ den. 625 So.2d 1040 (La.1993). What is being compensated is the plaintiff's "lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity." Id.
Jeffery Carlisle, vocational rehabilitation counselor, testified that Hoskin's "placeability" outside his occupation of a heavy equipment operator might be impaired, but not with the assistance of a vocational rehabilitation counselor. Significantly, Carlisle opined that Hoskin "should be able to resume his usual work activity on a full-time basis."
Dr. Craig Feldbaum, expert in vocational rehabilitation and psychology rehabilitation counseling, testified that Hoskin undoubtedly "has employability," but that Hoskin has a "significant competitive disadvantage in the work force" because his "placeability" is impeded. Dr. Feldbaum explained that potential employers might hesitate to hire Hoskin because of his injury, even though his physicians did not restrict his activity. Dr. Feldbaum expressed concern over the safety of Hoskin and Hoskin's co-workers in the event Hoskin cannot perform his job.
Hoskin testified that since the accident he has operated an air boat and a bulldozer. The record contains evidence that after the accident Hoskin participated in a job (apparently in conjunction with his brother's business) for which he grossed $100,000. Based on prior tax returns, that income was very unusual. However, Hoskin testified that his participation included supervising and operating machinery. Even if securing that type of job is unusual, Hoskin's work is relevant to the trial court's determination of Hoskin's physical condition and ability to earn. The trial court did not abuse its discretion by denying recovery for loss of earning capacity.
In a related argument, Hoskin claims that the trial court improperly disallowed evidence of Hoskin's business finances. He argues the evidence is relevant to show he is a poor businessman and will have difficulty maintaining Hoskin, Inc. We do not consider that argument. The proffered evidence merely corroborates Hoskin's testimony concerning pre-accident debt, and any error was harmless.

Conclusion
We increase the past medicals to include $1,250.51 incurred for the rod removal surgery, and amend the award for past medicals to $88,005.68.
The trial court erred by applying an incorrect burden of proof for future medicals. We hold that Hoskin established future medical expenses by a preponderance of the evidence. We increase the future medicals by $9,980 to $12,500.
Because Hoskin proved the need for future surgery and the medical testimony established a six week recovery period, we award $1,500 for lost earnings due to the future ulnar nerve surgery.
The trial court abused his discretion by awarding only $200,000 for general damages. We increase the general damages by $100,000 to $300,000.
The judgment is affirmed in all other respects.
*216 AMENDED; AFFIRMED AS AMENDED.
SCHOTT, C.J., dissents with reasons.
SCHOTT, Chief Judge, dissenting:
In his reasons for judgment the trial judge found that plaintiff failed to establish entitlement to an award for future medical expenses. The judge cited and followed the ruling in Turner v. Pelican, 661 So.2d 1065, 1069 (La.App. 4 Cir.1995), that the record must establish that future medical expenses will be necessary and inevitable to support an award. Turner cited Dixon v. Winn-Dixie Louisiana, Inc. 638 So.2d 306, 322 (La.App. 4 Cir.1994). Dixon followed Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1262 (La.1993), in which the court quoted from its earlier opinion in Stiles v. K Mart Corp., 597 So.2d 1012, 1013 (La.1992), in which the court stated that the standard of proof for future medical expenses is that they be necessary and inevitable.
I cannot fault the trial court for applying Turner which is directly and correctly based upon pronouncements of the Supreme Court. While the majority opinion attempts to minimize the importance of the necessary and inevitable language in the first paragraph of Stiles because of the "more probably than not" phrase in the second paragraph, I find it significant that the court in Youn quoted only the first paragraph of Stiles and made no reference to the second paragraph.
Concluding that the correct standard is preponderance of the evidence, the majority opinion cites Rice v. ABC Ins. Co., 672 So.2d 1109, 1112 (La.App. 4 Cir.1996); Adams v. Lammon, 635 So.2d 373, 376 (La.App. 4 Cir. 1994); and Carmen v. Gonzalez, 637 So.2d 1108, 1112 (La.App. 4 Cir.1994). None of these cases discussed the necessary and inevitable standard pronounced by the Supreme Court. Rice cited a Second Circuit opinion, Adams cited a 1990 opinion of this court, and Carmen cites previous opinions of this court. In these three opinions this court merely affirmed awards of the trial courts. In neither case was there an issue as to the correct burden of proof for future medical expenses. I submit that these cases cannot furnish us with the authority to conclude that the correct standard is preponderance of the evidence, rather than the necessary and inevitable standard pronounced by the Supreme Court.
When something is inevitable it is certain to occur. When something is probable it is not. Apparently recognizing that the pronouncements of this court that "preponderance of the evidence" is inconsistent with the Supreme Court's pronouncements the majority opinion adopts a new standard of proofproof by a preponderance that future medicals will be necessary, a "probably necessary" standard. It is quite remarkable that the majority simply discards the "inevitable" standard of the Supreme Court and substitutes this new standard of proof.
In the final analysis I am not persuaded that the trial court abused its discretion in the amount of the award. On the issue of future medical expenses, Hoskins' testimony on direct examination of his interest in the future surgery must be evaluated in the light of this testimony on cross examination and the trial judge's function to make credibility determinations. As to the general damage award of $200,000, it is on the low side, but not below the amount within the discretion of the trial court.
I would affirm the judgment except for the addition of $1,250.51 for past medical expenses.
NOTES
[1] References to Dr. Digrado's testimony are to his deposition which was admitted into evidence. Other witnesses who testified by deposition include Dr. Charles Dupin, Dr. Craig Feldbaum and Dr. Brian Jordan.
[2] Three receipts in the record total $97.92 for prescriptions, but at oral argument counsel agreed that $50.51 was attributable to this accident.