| JONATHAN AKERS AND CYNTIANA AKERS | * | NO. 2024-CA-0033 |
| | * | |
| VERSUS | * | COURT OF APPEAL |
| | * | |
| JOSEPH DOUGLAS, DARYL MALONE, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY AND PROSIGHT SPECIALITY INSURANCE BROKERAGE, LLC | * | FOURTH CIRCUIT |
| | * | STATE OF LOUISIANA |
| | * * * * * * * | |

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2020-10639, DIVISION "E"
Honorable Omar Mason, Judge
* * * * * *
**Judge Nakisha Ervin-Knott**
* * * * * *

(Court composed of Chief Judge Terri F. Love, Judge Rachael D. Johnson, Judge Nakisha Ervin-Knott)

Jake J. Weinstock
Irvy E. Cosse, III
COSSE LAW FIRM, LLC
1515 Poydras Street, Suite 900
New Orleans, LA 70112

    COUNSEL FOR PLAINTIFFS/APPELLEES

Sidney J. Angelle
LOBMAN, CARNNAHAN, BATT, ANGELLE, AND NADER
400 Poydras Street
Suite 2300
New Orleans, LA 70130

    COUNSEL FOR DEFENDANT/APPELLANT

           **AFFIRMED**
           **AUGUST 16, 2024**

New York Marine and General Insurance Company ("New York Marine"), seeks review of the trial court's August 10, 2023 bench trial judgment awarding monetary damages to Jonathan Akers ("Mr. Akers") and Cyntiana Akers ("Mrs. Akers") (collectively "The Akers"); October 24, 2023 judgment denying Defendants' – Joseph Douglas ("Mr. Douglas"), Bensco of Louisiana, LLC ("Bensco"), and New York Marine – motion for new trial; and October 24, 2023 judgment granting the motion to tax costs filed by the Akers. After considering the record before this Court, we affirm the trial court's judgments.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This civil action emanates from a motor vehicle accident that occurred on April 10, 2020, at the intersection of Eastover Drive and Lake Forest Boulevard. Defendant-driver, Mr. Douglas, was traveling southbound on Eastover Drive and proceeded to make a right turn onto Lake Forest Boulevard as the Akers were traveling westbound on Lake Forest Boulevard, resulting in a collision between the two vehicles.[1]

---

[1] At the time of the accident, Mr. Douglas was operating a vehicle owned by Daryl Malone ("Mr. Malone"). Prior to the accident, Mr. Douglas – an employee of a local car dealership – had dropped off a loaner vehicle to Mr. Malone and picked up his vehicle to drive it to the dealership.

The Akers filed a petition for damages on December 15, 2020, naming several parties, including Mr. Douglas, as Defendants.[2] Subsequently, the Akers filed a first amended petition for damages to add New York Marine as a Defendant.[3] Yet, again, the Akers filed a second amended petition for damages to add Bensco as a Defendant.[4] This matter proceeded as a bench trial on July 31, 2023, during which three witnesses testified: Mrs. Akers, Mr. Akers, and Dr. Patrick Waring ("Dr. Waring"), the Akers' treating physician and expert in pain management. The deposition of Mr. Douglas was also introduced into evidence at trial.

At the close of trial, the trial court took the matter under advisement and gave the parties an opportunity to submit post-trial memoranda. On August 10, 2023, the trial court issued a judgment. In its judgment, the trial court found Mr. Douglas solely (100%) negligent in causing the collision. The trial court awarded general damages in the amount of $376,000.00 to Mr. Akers – $160,000.00 for his past physical pain and suffering, mental anguish and distress, and loss of enjoyment of life; and $216,000.00 for his future physical pain and suffering, mental anguish and distress, and loss of enjoyment of life – and $376,000.00 to Mrs. Akers – $160,000.00 for her past physical pain and suffering, mental anguish and distress, and loss of enjoyment of life; and $216,000.00 for her future physical pain and suffering, mental anguish and distress, and loss of enjoyment of life. Additionally, the trial court awarded special damages in the amount of $74,607.43 for past medical

---

[2] The other named Defendants included Mr. Malone; State Farm Mutual Automobile Insurance Company ("State Farm"), Mr. Malone's vehicle insurer; and Prosight Specialty Insurance Brokerage ("Prosight"), Mr. Douglas' alleged insurer.
[3] Initially, the Akers believed Prosight was both the brokerage firm and insurance carrier for Mr. Douglas. Through discovery, they learned that New York Marine was in fact Mr. Douglas' insurer.
[4] Bensco was Mr. Douglas' employer at the time of the accident. As Mr. Douglas was in the course and scope of his employment at the time of the accident, the Akers alleged that Bensco was vicariously liable for his actions.

expenses and $117,773.64 for future medical expenses to Mr. Akers, and $83,969.74 for past medical expenses and $90,580.23 for future medical expenses to Mrs. Akers.

In response to the trial court's judgment, the Akers filed a motion to tax costs on August 16, 2023. Five days later, Defendants – Mr. Douglas, Bensco, and New York Marine – followed with filing a motion for new trial. Both motions were set for hearing on the same day, and on October 24, 2023, the trial court issued two separate judgments granting the motion to tax costs and denying the motion for new trial. New York Marine timely filed a petition for suspensive appeal on November 20, 2023, and the order granting the suspensive appeal was signed on the same day.

## DISCUSSION

On appeal, New York Marine asserts five assignments of error: (1) the trial court abused its discretion in granting general damages awards for Mr. Akers and Mrs. Akers clearly contrary to the law and evidence presented at trial; (2) the trial court erred in allowing trial by ambush and granting excessive future medical expenses to Mr. Akers and Mrs. Akers; (3) the trial court erred in admitting uncertified medical bills of Dr. Waring into the court record to determine Mr. Akers' and Mrs. Akers' past medical expenses; (4) the trial court erred in accepting Dr. Waring's testimony regarding causal relation of Plaintiff, Mrs. Akers', lumbar disc symptoms and treatment to the subject accident; (5) the trial court abused its discretion in denying Defendants' motion for new trial.

***Assignment of Error Number One: The trial court abused its discretion in granting general damages award for Mr. Akers and Mrs. Akers clearly contrary to the law and evidence presented at trial.***

In its first assignment of error, New York Marine contends the trial court's award of general damages to the Akers was clearly contrary to the law and evidence presented at trial. "General damages are defined as 'those which may not be fixed

3

with pecuniary exactitude,' instead, they 'involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms.'" *Preston v. Certain Underwriters at Lloyd's London*, 2023-0277, p. 7 (La. App. 4 Cir. 1/22/24), 381 So.3d 827, 833. Thus, "general damage awards are reviewed under the 'much discretion' standard of La. C.C. art. 1999, which provides '[w]hen damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages.'" *Id.* (citations omitted). Recently, this Court addressed the appellate review of general damage awards and stated:

> Appellate courts review a general damage award using a two-step analysis. *Pete v. Boland Marine & Mfg. Co., LLC*, 23-00170, p. 10 (La. 10/20/23), 379 So.3d 636, 644, *reh'g denied*, 23-00170 (La. 12/7/23), 374 So.3d 135. The initial inquiry is whether the trier of fact abused its discretion in assessing the amount of damages. *Id.* The Louisiana Supreme Court recently modified this analysis in that, "to evaluate this issue, an appellate court is to include a consideration of prior awards in similar cases, as well as the particular facts and circumstances of the case under review." *Id.* If the appellate court finds an abuse of discretion, the court must then consider those prior awards to determine "the highest or lowest point which is reasonably within that discretion." *Id.* (quoting *Jones*, 22-00841, p. 16, 359 So.3d at 464).
> "The trier of fact is afforded much discretion in assessing the facts and rendering an award because it is in the best position to evaluate witness credibility and see the evidence firsthand." *Bouquet v. Wal-Mart Stores, Inc.*, 08-0309, p. 4 (La. 4/4/08), 979 So.2d 456, 459. The role of an appellate court in reviewing a general damages award is not to decide what it considers to be an appropriate award but rather to review the exercise of discretion by the trier of fact. *Id.*, 08-0309, p. 5, 979 So.2d at 459. "This vast discretion is such that an appellate court should rarely disturb an award of general damages." *Howard v. Union Carbide Corp.*, 09-2750, p. 5 (La. 10/19/10), 50 So.3d 1251, 1255-56.

*Lombard v. Nobre*, 2023-0746, pp. 19-20 (La. App. 4 Cir. 6/18/24), --- So.3d ---, 2024 WL 3041365, at *9. "The factors to be considered in assessing quantum of general damages for pain and suffering are severity and duration." *Preston*, 2023-

0277 at p. 8, 381 So.3d at 834. Therefore, "this Court is obligated to consider both the facts contained in the record and prior damage awards in cases similar to the instant matter." *Id.*

Turning to the matter herein, New York Marine asserts the Akers' individual general damage awards of $376,000.00 – $160,000.00 in past general damages and $216,000.00 in future general damages – must be lowered to $150,000.00 individually based on the facts and circumstances of their injuries. An examination of the record reflects Mr. Akers was sitting in the front passenger seat of his vehicle at the time of the accident and sustained injuries to the lower left and right sides of his back. Although he felt back pain the day after the accident, Mr. Akers did not go to the emergency room nor urgent care. Rather, he was first seen by Dr. Chad Domangue ("Dr. Domangue") a week after the accident. Under Dr. Domangue's care, Mr. Akers received one steroid injection in his back on June 4, 2020, and was prescribed pain medication. While the steroid injection and pain medication helped with his back, it did not permanently resolve Mr. Akers' lower back pain. His last visit with Dr. Domangue was on March 26, 2021.

After treating with Dr. Domangue, Mr. Akers transferred his care to Dr. Waring and was first seen by him on June 22, 2021. During his first visit, Mr. Akers reported a six or seven out of ten (6 or 7/10) pain level in his back. For over two years, Dr. Waring has treated Mr. Akers for his axial lower back pain arising from his facet joints with radiofrequency neurotomy procedures. Dr. Waring testified that he performed two right-sided L4-S1 radiofrequency neurotomy procedures and two left-sided L4-S1 radiofrequency neurotomy procedures on Mr. Akers. Based on his personal study, practice patterns, and multiple patients, Dr. Waring opined that Mr. Akers will need to repeat these radiofrequency neurotomy procedures once a year

5

for the next six years on each side, for a total of twelve procedures over the next six years.

The record establishes that after the April 2020 accident, Mr. Akers experienced periods of time where the pain levels in his back were minimal. However, these periods of minimal-to-no pain were directly connected to either an epidural steroid injection coupled with prescribed pain medication or radiofrequency neurotomy procedures. Although Mr. Akers injured his back in a January 13, 2017 accident and sought chiropractic treatment, he was pain free in his lower back for two to three years preceding the April 2020 accident. Further, Mr. Akers testified that while he used to participate in weightlifting prior to the April 2020 accident, he no longer weightlifts as a result of his post-accident back pain. Moreover, as a result of his post-accident back pain, Mr. Akers testified that his intimacy with his wife has been negatively impacted.

Shifting to Mrs. Akers, unlike Mr. Akers – who did not experience any back pain until the next day – Mrs. Akers reported experiencing back pain two hours after the April 2020 accident. Similar to Mr. Akers, Mrs. Akers began treating with Dr. Domangue prior to treating with Dr. Waring. On June 8, 2020, Dr. Domangue performed a right-sided L3-S1 radiofrequency neurotomy procedure, where she experienced ninety percent (90%) relief for ten months.

Mrs. Akers also transferred her care to Dr. Waring and was first seen by him on June 22, 2021. During her first visit, Mrs. Akers reported a five or six out of ten (5 or 6/10) pain level in her lower back. For over two years, Dr. Waring has treated Mrs. Akers for her axial lower back pain arising from her facet joints and radicular spine pain. Dr. Waring performed a radiofrequency neurotomy procedure on September 22, 2022, and a right-sided epidural steroid injection – aimed at the nerve

root located at L4-5 – on February 6, 2023, to address some worsening right lower extremity pain. During his last procedure on June 6, 2023, Dr. Waring repeated the radiofrequency neurotomy procedure and "folded", or included, the epidural steroid injection into the same radiofrequency procedure. Based on Mrs. Akers' apparent treatment patterns, Dr. Waring opined that she will need one and a half radiofrequency neurotomy procedures a year for six years and three epidural steroid injections per year.

Prior to the April 2020 accident, Mrs. Akers did not have a history of lower back problems or treatment. Mrs. Akers testified that she enjoyed running errands – going to different flea markets and stores – on the weekends with her daughter. However, since the April 2020 accident, she goes to the store on an "as needed" basis and has to return straight home due to her back pain. Additionally, Mrs. Akers' lower back pain has interfered with her ability to cook and bake. While she used to host Thanksgiving dinner at her house, Mrs. Akers testified that she has not hosted this holiday dinner at her house for two years due to her inability to stand for long periods of time. Moreover, as a result of her post-accident back pain, Mrs. Akers' intimacy with her husband has been negatively impacted.

On appeal, New York Marine cites to several cases to support its position that the $376,000.00 general damages awards to the Akers individually should be reduced to $150,000.00. In *Mixter v. Wilson*, Ms. Mixter was involved in a motor vehicle accident and sustained cervical spine injuries requiring treatment with cervical epidural injections. 2010-0464, p. 3 (La. App. 5 Cir. 12/14/10), 54 So.3d 1164, 1167. The Fifth Circuit determined the "lowest permissible award to Ms. Mixter for her pain and suffering caused by this accident is $30,000.00." *Id*. at p. 7, 54 So.3d at 1169. Unlike Ms. Mixter, who dealt with injuries to her cervical spine,

7

the Akers' injuries affected their lumbar spines. As a result of their lumbar spine injuries, the Akers underwent several radiofrequency neurotomy procedures and require more of these procedures over the span of six years in the future, whereas Ms. Mixter just received cervical epidural injections.

In *Donaldson v. Hudson*, Mr. Donaldson sustained injuries to his neck and spine as a result of a motor vehicle accident. 2012-1013, p. 7 (La. App. 4 Cir. 4/10/13), 116 So.3d 46, 51. Due to his injuries, Mr. Donaldson received cervical facet injections in order to temporarily relieve the pain, and Mr. Donaldson's chiropractor and neurosurgeon testified that he would be a good candidate for a rhizotomy. *Id.* This Court affirmed the jury's general damage award of $125,000.00. *Id.* Similar to Ms. Mixter, Mr. Donaldson received cervical injections, while the Akers were treated with radiofrequency neurotomy procedures. Even though Mr. Donaldson was a "good candidate for a rhizotomy," he did not undergo the procedure, and there was no evidence presented at trial to show that multiple rhizotomies would be necessary over the span of several years. Conversely, in the matter herein, Dr. Waring specifically opined that the Akers would need multiple radiofrequency neurotomy procedures over the span of six years – twelve procedures for Mr. Akers and nine procedures for Mrs. Akers.

Finally, in *Hammons v. St. Paul*, Mr. Hammons injured his neck and back in a motor vehicle accident. 2012-0346, p. 1 (La. App. 4 Cir. 9/26/12), 101 So.3d 1006, 1008. Two months after the accident, Mr. Hammons' back pain resolved; however, his neck pain continued. *Id.* at p. 2, 101 So.3d at 1008. He was diagnosed with facet syndrome and received a series of steroid injections to help with pain. *Id.* at p. 3, 101 So.3d at 1009. The injections proved to be unsuccessful, and ultimately, Mr. Hammons underwent a rhizotomy. *Id.* The jury awarded Mr. Hammons a total of

$65,000.00 in general damages - $50,000.00 for past general damages and $15,000.00 for future general damages. *Id*. at p. 4, 101 So.3d at 1010. On appeal, this award amount was upheld. Again, Mr. Hammons' injuries centered around his cervical spine and not his back, whereas the Akers' injuries affected their lumbar spines. Moreover, while Mr. Hammons underwent one rhizotomy, he did not undergo multiple rhizotomies, nor was he going to undergo additional rhizotomies in the future. On the other hand, the record clearly established that the Akers had each undergone more than one radiofrequency neurotomy procedure prior to trial, and future procedures were more probable than not. Considering the dissimilarities in injuries and treatment between the plaintiffs in New York Marines' cited cases and the Akers, the damage awards in these cases do not properly guide this Court in determining whether an abuse in discretion has occurred regarding the trial court's award of general damages to the Akers.

New York Marine attempts to discredit the Akers' reliance on *May v. Regional Transit Authority*, to support the trial court's general damages award. 2019-0510 (La. App. 4 Cir. 12/30/19), 289 So.3d 195. In *May*, the plaintiff – Ms. May – was involved in a motor vehicle accident where she sustained injury to her back. *Id*. at pp. 3-5, 289 So.3d at 198-199. The results of a lumbar MRI "revealed a 6.6 mm herniation and annular tear at L5-S1, disc bulging at L4-5, and fact hypertrophy at L3-4, L4-5, and L5-S1." *Id*. at p. 5, 289 So.3d at 199. Her treating neurosurgeon opined that her symptoms stemmed from her facet joints and recommended she undergo a lumber epidural steroid injection and facet blocks. *Id*. Additionally, her neurosurgeon opined that she was a candidate for lumbar fusion surgery at the L3-4 level. *Id*. Not wanting to undergo surgery, Ms. May was referred to a pain management physician who performed a lumber epidural steroid injection,

9

bilateral lumbar medical branch blocks, and two bilateral rhizotomy procedures. *Id.* at pp. 5-6, 289 So.3d at 199. The pain management physician opined that in order to address her back pain, Ms. May would need one lumber rhizotomy every nine months for the next seven years. *Id.* at p. 7, 289 So.3d at 199. Ms. May testified that as a result of the accident, "she has continued throbbing, pain, and burning in her back and/or running down her legs every day." *Id.* at p. 9, 289 So.3d at 201. She further testified that she ceased many of her pre-accident activities, "including working as a sitter, traveling with family, gardening, fishing, and exercising regularly." *Id.*

The *May* trial court awarded Ms. May general damages in the amount of $560,000.00. *Id.* at p. 6, 289 So.3d at 200. On appeal, this Court reduced this amount to $500,000.00 due to the cap on liability against political subdivisions pursuant to La. R.S. 13:5106(B). *Id.*, 2019-0510 at p. 7, 289 So.3d at 200. Yet, in all other respects, this Court affirmed the trial court's general damages award, finding:

> [I]t is apparent that the trial judge was clearly favorably impressed with the credibility of Ms. May's experts and of Ms. May regarding the extent of her physical injuries, pain, and suffering, and her physical limitations. Given the vast discretion of the trial court in assessing general damages, we find no abuse of discretion.

*Id.* at p. 9, 289 So.3d at 201.

Comparing the *May* case to the matter herein, it is evident that the lumbar injuries sustained by Ms. May were more severe than the Akers' lumbar injuries, especially considering the fact that Ms. May had a lumber fusion (surgery) recommendation and the Akers did not have surgery recommendations. However, Ms. May's $500,000.00 general damage award was more than the $376,000.00 general damages awards to the Akers individually. Furthermore, Ms. May's course of treatment, including the need for repeated rhizotomies over the span of seven

10

years, is very similar to the Akers' course of treatment, which includes the need for repeated radiofrequency neurotomy procedures over the course of six years. Additionally, just as Ms. May testified to the pain she experiences post-accident and its negative impact on her daily life, the Akers testified to the pain they experience in their lower backs and its negative impact on their daily lives.

After examining the particular facts of this case, and considering the *May* case, we find no abuse of discretion in the trial court's assessment of general damages as there is ample evidence in the record to support the $376,000.00 general damages awards in favor of the Akers individually.

***Assignment of Error Number Two: The trial court erred in allowing trial by ambush and granting excessive future medical expenses to Mr. Akers and Mrs. Akers.***

Next, in its second assignment of error, New York Marine avers the trial court allowed trial by ambush and awarded excessive future medical expenses to Mr. Akers and Ms. Akers. "The proper standard for determining whether a plaintiff is entitled to an award of future medical expenses is 'proof by a preponderance of the evidence that the future medical expenses will be medically necessary.'" *Kimble v. Curahealth New Orleans LLC*, 2021-0389, p. 16 (La. App. 4 Cir. 12/1/21), 367 So.3d 644, 655 (quoting *Hoskin v. Plaquemines Par. Gov't*, 1997-0061, pp. 4-6 (La. App. 4 Cir. 12/1/97), 703 So. 2d 207, 210-11). Importantly,

> Future medicals need not be established with mathematical certainty...Although a plaintiff is not required to prove the exact value of the necessary expenses, some evidence to support the award must be contained in the record. If the fact finder can determine from...evidence a minimal amount that reasonable minds could agree upon, then an award is proper.

*Hankton v. State,* 2019-0557, p. 11 (La. App. 4 Cir. 3/4/20), 294 So.3d 25, 34 (citations omitted). "In making a factual conclusion regarding damages, great

deference is afforded a judge's assessment of the appropriate amount of damages." *Id.* (citing *Menard v. Lafayette Ins. Co.*, 2009-1869, p. 14 (La. 3/16/10), 31 So.3d 996, 1007). Therefore, "[a]n appellate court, in reviewing a judge's factual conclusions with regard to special damages, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong." *Kimble*, 2021-0389 at p. 16, 367 So.3d at 655 (citation omitted). "Where two permissible views of the evidence exist, the fact-finder's choice cannot be manifestly erroneous or clearly wrong." *Id.* (citation omitted).

New York Marine maintains the trial court erred in awarding future medical expenses in the amount $117,773.64 to Mr. Akers and $90,580.23 to Mrs. Akers, as these amounts deviated from the proposed amounts in their life care plans. As part of this litigation, the Akers retained an expert, Joyce Beckwith ("Ms. Beckwith") of Conservant Healthcare, to prepare their life care plans. According to Ms. Beckwith's life care plans, Mr. Akers' future medical expenses totaled $67,874.41, and Mrs. Akers' future medical expenses totaled $68,227.11. At trial, Ms. Beckwith did not testify. Instead, the Akers relied on Dr. Waring's testimony to establish their future medical expense amounts.

The two life care plans were dated December 2, 2021, less than six months after Dr. Waring began treating the Akers. Although Ms. Beckwith consulted with Dr. Waring in preparing the life care plans, it is evident that these December 2, 2021 life care plans were premature, as Dr. Waring had been treating the Akers for well over a year after these plans were prepared. As the current treating physician, Dr. Waring was better suited to provide current figures regarding future medical expenses. Moreover, New York Marine was not "ambushed" by Dr. Waring's

testimony, as it failed to depose or issue any discovery to Dr. Waring regarding any future medical expenses in advance of trial. Thus, the trial court was within its discretion to deviate from Ms. Beckwith's life care plans and consider Dr. Waring's testimony regarding the Akers' future medical care and expenses.

Dr. Waring testified that going forward, Mr. Akers will need to repeat the radiofrequency neurotomy procedures for both right and left sides once a year for the next six years, which is a total of twelve procedures, and he will have three to four doctor's visits each year. Additionally, Dr. Waring testified that the charge price for each radiofrequency neurotomy is $4,300.00, and facility fee for each radiofrequency neurotomy is $4,764.47, and the charge price for each doctor's visit is $500.00. Therefore, based on his need for future treatment and the associated charge prices, Dr. Waring opined the total estimated cost for Mr. Akers' future medical expenses is $117,773.64 and attributed Mr. Akers' lower back pain and need for future treatment to the April 2020 accident. Given the length of treatment Mr. Akers requires for his lower back pain and the expenses associated with these treatments, we find the $117,773.64 award for future medical expenses reasonable.

Concerning Mrs. Akers, Dr. Waring testified that going forward, Mrs. Akers will need one and a half radiofrequency neurotomy procedures a year for six years and three epidural steroid injections each year that can be folded into the radiofrequency neurotomy procedures at no additional cost, which is a total of nine procedures, and she will have three to four doctor's visits each year. Additionally, Dr. Waring testified that the charge price for each radiofrequency neurotomy is $4,300.00, and facility fee for each radiofrequency neurotomy is $4,764.47, and the associated charge price for each doctor's visit is $500.00. Therefore, based on her need for future treatment and the associated charge prices, Dr. Waring opined the

13

total estimated cost for Mrs. Akers' future medical expenses is $90,580.23 and attributed Mrs. Akers' lower back pain and need for future treatment, specifically the radiofrequency neurotomy procedures, to the April 2020 accident. Given the length of treatment Mrs. Akers requires for her lower back pain and the expenses associated with these treatments, we find the $90,580.23 award for future medical expenses reasonable.

For these reasons, we find the trial court's award of $117,773.64 to Mr. Akers and $90,580.23 to Mrs. Akers for future medical expenses was supported by sufficient evidence in the record.

***Assignment of Error Number Three: The trial court erred in admitting uncertified medical bills of Dr. Waring into the court record to determine Mr. Akers and Mrs. Akers past medical expenses.***

Further, in its third assignment of error, New York Marine maintains the trial court erred in admitting Dr. Waring's uncertified medical bills into the record, which were used to calculate the Akers' past medical expenses. "A trial court's decision on the admissibility of evidence is subject to the abuse of discretion standard." *Landry v. Hypolite,* 2023-0635, p.17 (La. App. 3 Cir. 3/6/24), 381 So.3d 977, 988 (citing *Menard v. Holland*, 2005-353, p. 7 (La. App. 3 Cir. 12/30/05), 919 So.2d 810, 815). Consequently, "the trial court has vast discretion in deciding the admissibility of evidence, and its decision will not be reversed on appeal absent an abuse of that discretion." *Id.* (citation omitted). However, New York Marine asserts the trial court committed a legal error in admitting Dr. Waring's uncertified medical bills, therefore, the *de novo* standard of review should apply instead of the abuse of discretion standard ("When legal error interdicts the fact-finding process, the manifest error standard no longer applies to any findings affected by that legal error. If the record is otherwise complete, the reviewing court should conduct a de

novo review of the interdicted findings." *Irwin v. Brent*, 2023-0475, p. 5 (La. App. 4 Cir. 7/19/24), --- So.3d ---, 2024 WL 3466371, at *3 (citing *Landry v. Bellanger*, 2002-1443, pp. 15 (La. 5/20/03), 851 So.2d 943, 954)).

Louisiana Revised Statutes 13:3714(A) (emphasis added) specifies:

> Whenever a certified copy of the chart or record of any hospital, signed by the administrator or the medical records librarian of the hospital in question, or **a copy of a bill for services rendered**, medical narrative, chart, or record of any other state health care provider, as defined by R.S. 40:1299.39(A)(1) and any other health care provider as defined in R.S. 40:1299.41(A), **certified or attested to** by the state health care provider or the private health care provider, is offered in evidence in any court of competent jurisdiction, it shall be received in evidence by such court as prima facie proof of its contents, provided that the party against whom the bills, medical narrative, chart, or record is sought to be used may summon and examine those making the original of the bills, medical narrative, chart, or record as witnesses under cross-examination.

Louisiana Revised Statute 13:3714(A) provides that when a copy of a bill for services provided is certified or attested to by the health care provider and is offered in evidence, it **shall** be admitted into evidence if the party against whom the bill is being used is given an opportunity to cross-examine those who generated the bill. *See Guillory v. Progressive Ins. Co., et al*, 2012-1284, pp. 9-10 (La. App. 3 Cir. 7/3/13), 117 So.3d 318, 325-26. An examination of the law and facts demonstrate the trial court did not commit legal error in admitting Dr. Waring's medical bills from Diagnostic Management Affiliates PPO, LLC ("DMA"); thus, the abuse of discretion standard is the proper standard of review.

Although the Akers provided certified medical records from Dr. Waring and his office, Pain Intervention Center, these records did not contain his medical billing records. The Akers attempted to introduce Dr. Waring's medical billing that contained a certification page from DMA, a third-party medical funding company that contracts with Dr. Waring and the Pain Intervention Center. Further, New York

15

Marine maintains a DMA representative cannot certify billing documents it did not create, and Dr. Waring cannot certify documents provided by a third-party. Counsel for New York Marine objected to their admittance into evidence due to the fact that these records from DMA were first provided to counsel the day before trial via Dropbox, and DMA is not a healthcare provider under La. R.S. 13:3714(A). Counsel for the Akers responded that the medical records had been provided to opposing counsel well in-advance of trial; however, the certification page was dated July 30, 2023 – the day before trial – in order to include the most up to date billing information. Further, due to the fact that Dr. Waring was testifying and could authenticate his own billing, the medical billing records would be properly authenticated and admitted into evidence.

In testifying at trial, Dr. Waring attested to several facts, including, but not limited to: (1) he has a contract with DMA, for his physician's fees, and Pain Intervention Center has a contract with DMA as well; (2) he selects the CPT and diagnostic codes for billing purposes; (3) the CPT and diagnostic codes are inputted into the system by himself or a Pain Intervention Center employee; and (4) his signature is located at the bottom of the bills. Additionally, counsel for the Akers presented a letter addressed to his law office from Pain Intervention Center that instructed counsel to obtain certified copies of the medical billing records from DMA, who were provided with the billing records from Pain Intervention Center. Dr. Waring confirmed that the signature at the bottom of the letter was from a Pain Intervention Center employee. Considering his testimony on the record concerning the medical billing, and the fact that counsel for New York Marine had the opportunity to cross-examine Dr. Waring about his billing, Dr. Waring sufficiently certified his medical billing records under La. R.S. 13:3714(A), and the trial court

16

did not commit legal error. Accordingly, under an abuse of discretion standard of review, we find the trial court did not err in admitting Dr. Waring's medical billing as evidence.

***Assignment of Error Number Four: The trial court erred in accepting Dr. Waring's testimony regarding causal relation of Plaintiff, Mrs. Akers', lumbar disc symptoms and treatment to the subject accident.***

As the fourth assignment of error, New York Marine claims the trial court erred in causally relating Mrs. Akers' lumbar disc injuries to the April 2020 accident. Due to this alleged trial court error, New York Marine asserts Ms. Akers' past medical expenses must be reduced to exclude the medical treatment associated with the radicular pain from her lumbar disc – epidural steroid injection – and her general damages must be reduced to exclude any pain and suffering associated with her lumbar disc pain and steroid injection.

"A plaintiff in a tort case has the burden of proving by a preponderance of the evidence that the accident more probably than not caused the claimed disabling condition." *Ruffin v. Burton*, 2008-0893, p. 4 (La. App. 4 Cir. 5/27/09), 34 So.3d 301, 303 (citing *Jones v. Peyton Place, Inc.,* 1995-0574, p. 12 (La. App. 4 Cir. 5/22/96), 675 So.2d 754, 763). "This burden is satisfied if medical evidence is presented establishing that it is more probable than not that the claimed condition was caused by the accident." *Id.* at pp. 4-5, 34 So.3d at 303. However,

> [A] plaintiff may be aided by a presumption of causation "if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition."

*Id.* at p. 5, 34 So.3d at 304 (citing *Housley v. Cerise,* 579 So.2d 973, 980 (La.1991)). Nevertheless, the *Housley* presumption is not absolute and may be rebutted by

17

"showing that some other particular incident could have caused the disabling condition." *Id.* Ultimately, "[c]redibility determinations, including evaluating and resolving conflicting testimony, are factual findings governed by the well-settled manifest error standard of review." *Id.*

Dr. Waring was the sole medical expert who testified at trial regarding Mrs. Akers' injuries and treatment. He testified that his treatment of Mrs. Akers has focused on her axial lower back pain arising from her facet joints and radicular spine pain. As her current treating physician, Dr. Waring definitively related Mrs. Akers' lower back pain arising from her facet joints to the April 2020 accident. However, he was hesitant to relate her radicular pain to this accident because Mrs. Akers did not initially present to him nor Dr. Domangue with this complaint. When Dr. Waring reviewed Mrs. Akers' MRIs in preparation for trial, he testified to observing the right-sided L4-5 disc flattening the fecal sac and speculated that this pathology may be a cause of her radicular spine pain. He followed up his testimony by opining, "Some of this may have been there all along." Dr. Waring further opined that he is unsure whether the disc flattening the fecal sac predated the accident. Nevertheless, Dr. Waring acknowledged Mrs. Akers' radicular pain could be related to his treatment of the facet pain, which he related to the April 2020 accident.

Regardless of whether the right-sided L4-5 disc flattening the fecal sac predates the accident, the record clearly establishes that Mrs. Akers never complained of any back pain or had any back treatment prior to the April 2020 accident. Mrs. Akers testified that she did not have a history of lower back pain or treatment. Additionally, Dr. Waring acknowledged that he reviewed Dr. Domangue's records, and Dr. Domangue related her pain symptoms to the April 2020 accident given Ms. Akers had no previous history of lumbar pain or radicular

18

symptoms before the accident. Furthermore, Dr. Waring testified that Mrs. Akers presented to him as a patient who had no previous history of back pain or treatment. New York Marine failed to present any evidence of Mrs. Akers being involved in an accident, incident, or event prior to the April 2020 accident that could be causally related to her radicular back pain. Even if her lumbar disc issues predated the April 2020 accident, there is sufficient evidence in the court record to support a finding that her radicular pain did not appear until after the April 2020 accident. Therefore, in weighing the credibility of the witnesses and evaluating the potentially conflicting testimonies, we find that the trial court was not manifestly erroneous in causally relating Mrs. Akers' lumbar disc injuries to the April 2020 accident. In light of this finding, we determine Mrs. Akers' past medical expenses and general damages award need not be reduced.

### *Assignment of Error Number Five: The trial court abused its discretion in denying Defendants' motion for new trial.*

In its fifth and final assignment of error, New York Marine asserts the trial court erred in denying its motion for new trial because good grounds existed for a new trial. The ruling on a motion for new trial is reviewed under an abuse of discretion standard of review. *Sunset Harbour, LLC v. Brown*, 2022-0572, p. 9 (La. App. 4 Cir. 1/9/23), 356 So.3d 1167, 1173 (citing *Jouve v. State Farm Fire & Cas. Co.*, 2010-1522, p. 15 (La. App. 4 Cir. 8/17/11), 74 So.3d 220, 229). Pursuant to La. C.C.P. arts. 1972 and 1973, New York Marine avers the grounds to grant a new trial included the trial court's judgment being contrary to the law and evidence.[5] In its

---

[5] Louisiana Code of Civil Procedure Article 1972 provides:

> A new trial shall be granted, upon contradictory motion of any party, in the following cases:

motion for new trial, New York Marine asserted: (1) the general damages awards for the Akers were clearly contrary to the law and evidence; (2) the trial court erred in determining the future medical expenses for the Akers; (3) Dr. Waring should not have been allowed to provide "on-the-fly" testimony regarding future medical expenses; and (4) the trial court committed legal error in admitting uncertified medical bills of Dr. Waring into the record. All of these assertions were re-urged in New York Marine's appeal and have been fully discussed above. We have already determined that New York Marine's assignments of error have no merit, and the trial court did not abuse its discretion in making its rulings and rendering judgment. Consequently, we find the trial court did not abuse its discretion in denying the motion for new trial.

## **DECREE**

For the foregoing reasons, we affirm the trial court's August 10, 2023 bench trial judgment awarding monetary damages to the Akers; October 24, 2023 judgment denying Defendants' motion for new trial; and October 24, 2023 judgment granting the motion to tax costs filed by the Akers.

**AFFIRMED**

---

(1) When the verdict or judgment appears clearly contrary to the law and the evidence.
(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.

La. C.C.P. art. 1973 states, "A new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law."